1   Daniel J. Weintraub – Bar #132111
2   David B. Zolkin – Bar #155410
    WEINTRAUB ZOLKIN TALERICO & SELTH LLP
3   11766 Wilshire Boulevard, Suite 730
    Los Angeles, CA 90025
4   Telephone: (310) 207-1494
    Email: dweintraub@wztslaw.com
5   Email: dzolkin@wztslaw.com

6   *General Bankruptcy Counsel to*
7   *Chapter 11 Debtor and Debtor in Possession,*
    *KOMBU KITCHEN SF LLC, dba NIBLL*

8

9

10          **UNITED STATES BANKRUPTCY COURT**

11      **CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

12   In re:                              Case No. 2:23-bk-17276-SK

13   KOMBU KITCHEN SF LLC, dba NIBLL,     Chapter 11, Subchapter V

14          Debtor and Debtor In Possession.   **LIMITED OPPOSITION OF DEBTOR
                                         TO MOTION OF F50 LEAGUE, LLC,
15                                       FOR RELIEF FROM AUTOMATIC
                                         STAY; DECLARATION OF DAVID B.
16                                       ZOLKIN IN SUPPORT THEREOF**

17                                       Hearing:
18                                       Date:       September 25, 2024
                                         Time:       8:30 a.m.
19                                       Courtroom:  1575
20                                                   255 East Temple Street
                                                     Los Angeles, CA 90012
21

22                                       Hon. Sandra R. Klein

23

24

25

26

27

28

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

1    KOMBU KITCHEN SF LLC, dba NIBLL (the "Debtor") hereby files this limited opposition

2    (the "Opposition"), to the *Motion For Relief From the Automatic Stay Under 11 U.S.C. § 362* (the

3    "Motion") [Dkt. No. 277], filed by F50 League, LLC ("Movant").

4    Movant and the Debtor are co-defendants in litigation (the "State Court Action") commenced

5    on October 12, 2023, by Deshawn Logan ("Plaintiff") in the Superior Court of California, County

6    of Los Angeles (the "State Court").  A copy of the complaint filed by Plaintiff is attached to the

7    proof of claim filed by Movant in this bankruptcy case (Claim No. 24), a true and correct copy of

8    which is attached hereto as **Exhibit 1**.

9    The Motion asserts that cause exists to grant relief from stay because Movant, which asserts

10    indemnification claims against the Debtor, will only seek to recover those claims from Middlesex

11    Insurance Company ("Insurer"), the Debtor's commercial general liability insurance provider, under

12    the Debtor's commercial general liability insurance policy with Insurer (as identified in the Motion,

13    the "Insurance Policy").

14    The Debtor does not oppose relief from the stay for Movant to proceed against the proceeds

15    of the Insurance Policy, provided that, if the stay is lifted, the lift stay order makes clear that (i) no

16    funds will be paid by the Debtor or its estate to any party as a result of any out-of-pocket deductible

17    or any other amount otherwise required for coverage, (ii) the lifting of the stay is to be limited only

18    to Movant and will not have the ancillary effect of lifting the stay for the benefit of Plaintiff or any

19    other party and (iii) any deficiency claim against the Debtor or its estate in connection with Claim

20    No. 24 or otherwise, is waived in its entirety.

21    Dated: September 10, 2024                    Respectfully submitted,

22                                                **WEINTRAUB ZOLKIN TALERICO & SELTH LLP**

23

24    By:   */s/ David B. Zolkin*
                    David B. Zolkin
25                  *General Bankruptcy Counsel to*
                    *Chapter 11 Debtor and Debtor in Possession,*
26                  *KOMBU KITCHEN SF LLC, dba NIBLL*

27

28

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

## DECLARATION OF DAVID B. ZOLKIN

I, David B. Zolkin, do hereby declare:

1.      I am an attorney at law, admitted to practice in all the courts of the State of California and in the United States District Court for the Central District of California.  The facts set forth herein are based upon my personal knowledge, and if called as a witness, I could and would testify competently thereto.

2.      I am partner in the law firm of Weintraub Zolkin Talerico & Selth LLP (the "Firm"), located at 11766 Wilshire Blvd., Suite 730, Los Angeles, California 90025. The Firm is general bankruptcy counsel to KOMBU KITCHEN SF LLC, dba NIBLL ("Kombu" or the "Debtor"), the debtor and debtor in possession in the above-captioned Subchapter V bankruptcy case.

3.      I submit this Declaration in support of the *Limited Opposition of Debtor to Motion of F50 League, LLC, for Relief from Automatic Stay* (the "Opposition") to which this Declaration is annexed.  Terms not defined herein shall have the same meanings ascribed to them in the Opposition.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of Claim 24 as it appears on the Court's electronic claims register for this Case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 10th day of September 2024, at Los Angeles, California.

    /s/ David B. Zolkin
    David B. Zolkin

WEINTRAUB ZOLKIN TALERICO & SELTH LLP
11766 WILSHIRE BLVD., SUITE 730
LOS ANGELES, CA 90025

# EXHIBIT 1

# Proof of Claim #24

**EXHIBIT 1 - Page 4**

**Fill in this information to identify the case:**

Debtor 1    Kombu Kitchen SF LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Central District of California**

Case number: **23–17276**

FILED

**U.S. Bankruptcy Court**
**Central District of California**

1/9/2024

**Kathleen J. Campbell, Clerk**

## Official Form 410
# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) that you received.

---

### Part 1: Identify the Claim

**1. Who is the current creditor?**

F50 League LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| F50 League LLC | |
| Name | Name |
| 900 Front Street, Suite 350 | |
| San Francisco, CA 94111 | |
| Contact phone      415–438–4600 | Contact phone |
| Contact email     gluk@cwlfirm.com | Contact email |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing?

---

**EXHIBIT 1 - Page 5**

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| 6. | **Do you have any number you use to identify the debtor?** | ☑ No |
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| 7. | **How much is the claim?** | $ 0.00 | **Does this amount include interest or other charges?** |
| | | | ☑ No |
| | | | ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). |
| | | Limit disclosing information that is entitled to privacy, such as healthcare information. |
| | | SEE ATTACHMENT |

| 9. | **Is all or part of the claim secured?** | ☑ No |
| | | ☐ Yes. The claim is secured by a lien on property. |
| | | **Nature of property:** |
| | | ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.* |
| | | ☐ Motor vehicle |
| | | ☐ Other. Describe: _____ |
| | | **Basis for perfection:** _____ |
| | | Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) |
| | | **Value of property:** $ _____ |
| | | **Amount of the claim that is secured:** $ _____ |
| | | **Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.) |
| | | **Amount necessary to cure any default as of the date of the petition:** $ _____ |
| | | **Annual Interest Rate** (when case was filed) _____ % |
| | | ☐ Fixed |
| | | ☐ Variable |

| 10. | **Is this claim based on a lease?** | ☑ No |
| | | ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| 11. | **Is this claim subject to a right of setoff?** | ☑ No |
| | | ☐ Yes. Identify the property: _____ |

**EXHIBIT 1 - Page 6**

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $ _____

☐ Up to $3,350 * of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $ _____

☐ Wages, salaries, or commissions (up to $15,150 *) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies  $ _____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
**18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   1/9/2024

MM / DD / YYYY

/s/  Galin G. Luk

Signature

Print the name of the person who is completing and signing this claim:

Name   Galin G. Luk

First name    Middle name    Last name

Title   Attorney

Company   Cox Wootton Lerner Griffin & Hansen, LLP

Identify the corporate servicer as the company if the authorized agent is a servicer

Address   900 Front Street, Suite 350

Number  Street

San Francisco, CA 94111

City  State  ZIP Code

Contact phone   415–438–4600     Email   gluk@cwlfirm.com

Official Form 410    Proof of Claim    page 3

EXHIBIT 1 - Page 7

## EXHIBIT A

Pursuant to Attachment A, Debtor Kombu Kitchen SF, LLC agreed to defend, indemnify and hold Creditor F50 League LLC harmless for incidents arising out of the subject contract [Services Supply Agreement, paragraph 9.1].  Debtor also agreed to secure insurance to cover any such claims and also agreed to name Creditor as an additional insured [paragraph 17.2].  A third party sued Creditor for an incident arising out of the subject contract and that claim is subject to Debtor's obligation to cover through its insurance policy.  *See* Attachment B.

EXHIBIT 1 - Page 8

# Attachment A

EXHIBIT 1 - Page 9



**SERVICES SUPPLY AGREEMENT**

**Key Terms**

| | |
|---|---|
| **SailGP:** | F50 League LLC, a Delaware limited liability company with its principal place of business at One Liberty Plaza, 165 Broadway, New York, NY 10006, USA |
| **Service Provider:** | Kombu Kitchen SF, LLC<br><br>8605 Santa Monica Blvd, PMB 80878<br><br>West Hollywood, CA 90069 |
| **Commencement Date:** | **6.21.23** |
| **Expiry Date:** | **8.1.23** |
| **Event:** | Oracle Los Angeles Sail Grand Prix \| Port of Los Angeles currently scheduled to take place on 22-23 July 2023 |
| **Services:** | Provide overall catering for the Adrenaline Lounge based on brief and proposal provided to Tom and Rob based on ████████████████████ ████████████████████████████████████████<br><br>The catering menu to be pre approved by SailGP and will align with SailGP food charter and menu/ingredients approved. |
| **Service Specification:** | Catering for Adrenaline Lounge Guests includes all food and beverages.<br><br>July 22-23, 2023 1:00PM-6:00PM<br>2 Day VIP Experience Lounge for 260 SailGP Corporate<br><br>Sponsor Attendees<br>9:00AM-6:00PM Coffee and Tea Service<br>Serving ████████████████████████<br><br>1:15PM-1:45PM Champagne Greeting<br>1:00PM-6:00PM Full Bar<br>Serving ████████████████████████████<br>██████████████████████████<br>██████████████<br>████████<br>████ |
| **Equipment:** | Supplier will provide any and all necessary equipment to provide the food and beverages and service for the overall event. SailGP will provide the power, waste and overall tent structure to operate within. |
| **Project Deliverables (if any):** | See above |
| **Service Timetable (if any):** | Final menus confirmed 30 days prior<br>Begin load in and setup on Wednesday July 19, 2023 and load out on |

EXHIBIT 1 - Page 10

# SAIL GP™

| | Monday July 24, 2023 |
|---|---|
| **SailGP Representative:** | Sam Buchanan |
| **Service Provider Representative:** | Matt Harley |
| **Key Personnel (if any):** | **Rob Colegate** |
| **Fees:** | Subtotal ▇<br>Tax Rate ▇<br>Tax ▇<br>Total ▇<br><br>Based on ▇ |
| **Expenses (if any):** | **N/A** |
| **Invoicing and Payment Schedule (if any):** | 50% payment due 6.21.2023<br>50% payment due 7.9.2023<br>Trailing invoice for any added services/headcounts approved by SailGP prior due 8.15.2023 |

### Standard Terms

SailGP and Service Provider (together the "**Parties**") hereby set out the commercial terms which they have agreed in respect of the Services being provided by Service Provider to SailGP.

These standard terms ("**Standard Terms**") together with the above key terms (the "**Key Terms**") and any Schedules (if applicable) shall constitute the entire agreement (the "**Agreement**") between the Parties as of the Commencement Date. Defined terms shall be as set out in the Key Terms, in these Standard Terms or in any Schedules (if applicable).  In the event of a conflict between the Standard Terms, Key Terms and any Schedules, the Key Terms shall prevail.

In the event that the Service Provider has their own terms and conditions, including but not limited to those referred to or appended to any invoice and/or purchase order provided to SailGP, this Agreement shall prevail in the event of any conflict over any other terms and conditions provided by or on behalf of the Service Provider.

## 1    Definitions

1.1    In this Agreement the following words and expressions shall have the following meanings:

**Applicable Laws** means any applicable: statute, statutory instrument, by law, order, directive, treaty, decree or law (including any common law, judgment, demand, order or decision of any court, regulator or tribunal); rule, policy, guidance or recommendation issued by any governmental, statutory or regulatory body (including international customs and import-export controls), industry code of conduct or guideline in force from time to time in any part of the world, and including any and all amendments to the same;

**Commercial Rights** means all rights of a commercial nature relating to the Series, whether now known or hereafter developed, including, without limitation, Intellectual Property Rights, advertising rights, media and so-called 'new media' rights, social media rights, streaming rights, website rights, merchandising rights, publishing rights, computer mobile telephony rights, games rights, betting and gaming rights, sponsorship rights, ticketing rights, marketing rights, hospitality rights, licensing rights, travel rights and any other similar rights;

**Confidential Information** any information of a confidential nature concerning the business, affairs, customers, clients, commercial partners, commercial sponsors, business practices, business prospects,  customers, marketing strategies, business development activities or suppliers of the other Party or of any member of its Group, including but not limited to information relating to a Party's operations, finances, pricing strategies, processes, plans, product information, know-how, designs, trade secrets, software, market opportunities and customers;

EXHIBIT 1 - Page 11

**SAILGP**™

**Data Protection Legislation** means the Data Protection Act 2018 (the "**Act**"), the General Data Protection Regulation 2016/679/EU ("**GDPR**"), the GDPR as it forms part of the law of England and Wales, Scotland and Northern Ireland by virtue of section 3 of the European Union (Withdrawal) Act 2018 and any other Applicable Laws relating to the processing of personal data under this Agreement including, without limitation, the Privacy and Electronic Communications (EC Directive) Regulations 2003, and all opinions and guidance issued from time to time in relation to the GDPR and the Act (including by the Information Commissioner's Office and European Data Protection Board) in each case as may be amended, superseded or replaced from time to time, including, without limitation, as a result of the United Kingdom's departure from the European Union;

**Deliverables** means the Project Deliverables (if any) and all plans, drawings, designs, documents, software programs, work product and other materials (including but not limited to those deliverables specified in the Key Terms, if any) that are prepared by or on behalf of the Service Provider in any form of media and are delivered to SailGP during the Term;

**Equipment** means the equipment set out in the Key Terms (if any) and the Service Provider Equipment;

**Expenses** means the Service Provider's expenses reasonably and proportionally approved in advance and incurred directly in the provision of the Services to be reimbursed by SailGP as listed in the Key Terms (if any), and/or as agreed between the Parties in writing from time to time;

**Good Industry Practice** means using standards, practices, methods, processes, organisation and procedures and exercising that degree of excellence, professionalism, skill and care, diligence, prudence and foresight to the highest standards that would reasonably and ordinarily be expected from a highly skilled and experienced, market leading organisation engaged in a similar type of undertaking providing services to the highest standard equivalent to the Services, Equipment and any Deliverables under the same or similar circumstances from time to time;

**Group** means, in relation to a person, that person, any subsidiary of that person, any holding company of that person and any subsidiary of any holding company of that person, in each case for the time being (the words "subsidiary" and "holding company" having the meanings given to them by section 1159 of the Companies Act 2006);

**Intellectual Property Rights** means patents, utility models, rights to inventions, copyright and neighbouring and related rights, trade marks, business names and domain names, rights in get-up and trade dress, goodwill and the right to sue for passing off, rights in designs, data, database rights, rights in data, rights to use, and protect the confidentiality of, confidential information (including know-how and trade secrets), design documents and drawings, and all other intellectual property rights, in each case whether registered or unregistered and including all applications and rights to apply for and be granted, renewals or extensions of, and rights to claim priority from, any rights and all similar or equivalent rights or forms of protection that subsist or will subsist at the date of this agreement  or in the future in any part of the world;

**Person** includes a firm, partnership, company, corporation, individual and any other legal entity, whether incorporated or unincorporated;

**Representatives** means those officers, employees, agents, representatives, or subcontractors of either Party engaged in the provision of the whole or any part of the Services, Equipment and any Deliverables, or who receive the whole or any part of the Services, Equipment and any Deliverables (as applicable);

**SailGP Entities** means any and all entities established from time to time to manage or operate the Series (including but not limited to the entities established to manage and operate individual SailGP teams) as well as any affiliated entities of such entities;

**SailGP Equipment** means any equipment, including tools, systems, technical hardware, cabling or facilities, provided by SailGP, its agents, subcontractors or consultants which is used directly or indirectly in the supply of the Services;

**SailGP Materials** means all documents, information, items and materials in any form (whether owned by SailGP or a third party), which are provided, from time to time, by SailGP to the Service Provider in connection with the Services, Equipment and Deliverables;

**Series** means the sailing league called "**SailGP**";

EXHIBIT 1 - Page 12

# SAILGP™

**Service Provider Equipment** means any equipment, including tools, systems, cabling or facilities, provided by the Service Provider, its agents, subcontractors or consultants, and used directly or indirectly in the supply of the Services; and

**Third Party Service Provider** means any and all third party service providers appointed by SailGP and/or any third parties which the Service Provider is required to use and/or work with by SailGP during the provision of the Services.

1.2    The following shall apply to this Agreement: (a) clause, schedule and paragraph headings shall not affect the interpretation of this Agreement; (b) unless the context requires, references to the plural include the singular and vice versa, and references to one gender include each other gender; (c) the words "including" and "include" shall mean "including without limitation" and "include without limitation" respectively; (d) any reference to legislation or a legislative provision is a reference to it as amended, extended or re-enacted from time to time.

## 2    Appointment of Service Provider

SailGP appoints Service Provider to supply the Services, Equipment and/or Deliverables (as applicable) on a non-exclusive basis during the Term and strictly in accordance with, and subject to, the Service Provider's compliance with the terms of this Agreement.

## 3    Service Provider's Obligations

3.1    The Service Provider warrants and represents that it has all requisite power and authority to enter into this Agreement and that it shall provide the Services, Equipment and any Deliverables, strictly in accordance with:

(a)    the provisions of this Agreement;

(b)    the Service Timetable and Service Specification;

(c)    Good Industry Practice;

(d)    all Applicable Laws; and

(e)    any and all reasonable instructions given by SailGP from time to time (including but not limited to any guidelines, policies, regulations and/or codes of SailGP).

3.2    Without prejudice to the generality of clause 3.1, the Service Provider warrants, represents and undertakes to SailGP it shall, during the Term:

(a)    comply with and proactively observe all Applicable Laws (including without limitation all rules, regulations, standards and guidance relating to health and safety and data security), and as notified to the Service Provider by SailGP from time to time and shall ensure the Services are not performed in a manner that is likely to be injurious to health or cause damage to property or create a nuisance;

(b)    co-operate with SailGP, any of SailGP's clients and/or any Third Party Service Provider in all matters relating to the Services, Equipment and Deliverables, and comply with any reasonable instructions given by SailGP, any of SailGP's clients and/or any Third Party Service Provider;

(c)    devote sufficient time, expertise and resources to ensure the proper delivery of the Services, Equipment and any Deliverables;

(d)    not do or omit to do anything which may cause SailGP to lose any licence, authority, consent or permission, or bring into disrepute, impair or adversely affect the name, image and/or reputation of SailGP or the SailGP Entities;

(e)    if SailGP is subjected to any unfavourable press, publication, report, scandal, contempt or other cause of public disrepute and/or reputational damage, work with SailGP in good faith to promote a positive and timely public response;

(f)    engage suitably experienced professional, knowledgeable, qualified, skilled and trained individuals to ensure the effective delivery of the Services, Equipment and any Deliverables in accordance with Good Industry Practice, Applicable Laws and the terms of this Agreement;

**EXHIBIT 1 - Page 13**

SAIL GP™

(g)     ensure and procure that all third party subcontractors engaged by the Service Provider in relation to the Services, Equipment and Deliverables are engaged on terms at least as onerous as the terms of this Agreement, and the Service Provider shall indemnify SailGP in full against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other professional costs and expenses) suffered or incurred by SailGP arising out of, or in connection with any acts or omissions of such third party subcontractors;

(h)     at all times have in place and maintain all necessary licences, authorities, consents and insurance which may be required in order for it to provide the Services, Equipment and any Deliverables in accordance with Good Industry Practice and Applicable Law and shall ensure that these are promptly uploaded into SailGP's Verifier system (or its replacement);

(i)     ensure the Service Provider Representative (who shall have the authority contractually to bind the Service Provider Representative on all matters relating to the Services) formally meets with the SailGP Representative as reasonably requested by SailGP from time to time to discuss the provision of the Services, Equipment and Deliverables in general and any issues arising from this Agreement;

(j)     not publicly hold itself out as an official supplier or official partner of SailGP or otherwise associate itself with SailGP without SailGP's prior written approval;

(k)     use the Key Personnel in a material and continuous manner in the active provision of the Services, Equipment and any Deliverables and inform SailGP of the absence (or the anticipated absence) of any of the Key Personnel, and if so required by SailGP, provide a suitably qualified replacement for such individual;

(l)     ensure accurate, complete and up to date records are maintained to evidence the provision of the Services, Equipment and Deliverables in accordance with Good Industry Practice and all Applicable Laws;

(m)     ensure that any Equipment (where applicable) is of satisfactory quality and fit for any purpose made known by SailGP, is free from defects in design, material and workmanship and conforms to any agreed specifications.; and

(n)     deliver, install, test, maintain, repair, dismantle and remove all Equipment in accordance with Good Industry Practice.

3.3     The Service Provider shall proactively ensure it is aware, at all times during the term of this Agreement, of any and all actual or anticipated changes in Applicable Laws which may impact the provision of the Services and/or the Fees and any additional expenses payable by SailGP, and shall immediately and proactively notify SailGP of any such actual or anticipated changes.

## 4     Representatives

4.1     The Service Provider shall ensure that all Service Provider Representatives observe all health and safety rules and regulations, any security requirements that apply to the Event and obtain and at all times maintain all necessary licences, consents and permits in order to be able to provide the Services, Equipment and/or Deliverables (as applicable).

4.2     SailGP shall have the right to refuse admission to, or order the removal from the performance of the delivery of the Services and/or Equipment, any Service Provider Representative who in the reasonable opinion of SailGP is not a fit and proper person to be on the Event premises and/or is not performing properly or effectively in their role.

4.3     It is agreed by the Parties that neither the Service Provider nor any of its representatives (including but not limited to the Service Provider Representative) may sign or otherwise conclude any agreement or bind SailGP in any way. Any attempt by Service Provider and/or its representatives to do so shall be deemed null and void. The Service Provider acknowledges that any agreement to be entered into in connection with the Services and/or Equipment shall be entered into directly by SailGP and the relevant third party.

## 5     Equipment

EXHIBIT 1 - Page 14



5.1     SailGP shall not be deemed to have accepted any Equipment until it has had reasonable time to inspect it following delivery and installation (if applicable) or, in the case of a latent defect, until after the latent defect has become apparent.

5.2     Without prejudice to any other right or remedy SailGP may have, SailGP may (at any time) reject any Equipment that does not comply with the provision of this Agreement and require the Service Provider to:

(a)     repair or replace the rejected Equipment at the Service Provider's risk and expense within 24 hours of being requested to do so; and/or

(b)     reduce or refund the Fees in respect of the rejected Equipment.

5.3     In respect of any hired Equipment on the Event site, the Equipment shall at all times remain the property of the Service Provider, and SailGP shall have no right, title, interest in or to the Equipment (save for the right to possession and use as per this Agreement).

5.4     The Service Provider shall deliver and install (if applicable) the Equipment in accordance with Good Industry Practice and Applicable Law, taking into account SailGP's instructions. Where relevant, installation shall include installing the Equipment and any associated structures, equipment and supports, as well as ensuring that all Equipment is clean, secure, presentable, fully functional and compliant with all health and safety, structural and other requirements.

5.5     Unless otherwise agreed, the Service Provider shall perform all testing activities to ensure the Equipment is fully functional and compliant with all legal, health and safety, structural and other requirements.

5.6     The Service Provider shall maintain, repair or replace the Equipment after it is installed and until it is dismantled at its cost.

5.7     The Service Provider shall perform all activities necessary to safely dismantle and remove the Equipment, associated equipment and supports ensuring that the Event site is left clean, tidy and presentable and, if necessary, repaired.

**6      Obligations of SailGP**

6.1     SailGP shall:

(a)     acting reasonably, co-operate with the Service Provider in all matters relating to the Services, Equipment and Deliverables;

(b)     appoint the SailGP Representative who shall have the authority contractually to bind SailGP on all matters relating to the Services, Equipment and Deliverables; and

(c)     provide in a timely manner, such documents, information and materials, access to facilities and other information which are necessary for the provision and delivery of the Services, Equipment and/or any Deliverables.

6.2     The liability of SailGP to the Service Provider under or in connection with this Agreement (including but not limited to in relation to any equipment hired from and/or provided by the Service Provider to SailGP) shall be limited to the Fees payable.

**7      Payments**

7.1     In consideration of the provision and delivery of the Services, Equipment and Deliverables, SailGP shall pay the Service Provider the Fees.

7.2     The Service Provider shall provide SailGP with an accurate and correctly issued invoice in writing in respect of the Fees for the Services, Equipment and Deliverables in accordance with any Invoicing and Payment Schedule.

7.3     SailGP shall reimburse any Expenses, which shall be payable by SailGP monthly in arrears on receipt of an appropriate and valid written invoice. For the avoidance of doubt, the Service Provider undertakes, warrants and represents it shall not incur any fees, expenses or other costs in connection with this Agreement unless expressly

EXHIBIT 1 - Page 15



set out in the Key Terms or approved by SailGP in writing, and SailGP shall not be liable for any fees, expenses or other costs incurred by SailGP in breach of this clause 7.3.

7.4    If the Event is cancelled or does not take place, including where this Agreement is terminated due to a Force Majeure Event before the Event can take place, pursuant to clause 14.4, the Service Provider will refund to SailGP any unspent portion of the Fees already paid by SailGP to the Service Provider. Additionally, to the extent the Service Provider has spent any portion of the Fees on products or vendors from which the Service Provider can procure a refund, the Service Provider shall promptly procure such refund and thereafter promptly return such refunded amounts to SailGP.

7.5    SailGP shall pay each valid invoice submitted to it by the Service Provider in accordance with this Agreement within thirty (30) days of receipt of such invoice to a bank account nominated in writing by the Service Provider.

7.6    In the event an invoice, or portion thereof, is disputed by SailGP, (a "**Disputed Amount**"), SailGP shall provide written notice of such dispute to the Service Provider within fourteen (14) days of receipt.   Where only part of the total sum included in an invoice is disputed, SailGP will pay the undisputed part on the due date in accordance with the terms of this clause 7. The balance (or such part of it as is to be paid following settlement of the dispute) will be paid promptly, and in any event within fifteen (15) days of settlement, unless the original due date of the invoice was later.

7.7    The Service Provider shall provide SailGP with access to all records, accounts and other documents which relate to the Fees and Expenses on a transparent and entirely open book basis.

7.8    All amounts expressed in this Agreement are expressed exclusive of value added tax or equivalent sales tax (if any) (**VAT**) which may be chargeable thereon and such VAT shall be payable in addition by SailGP upon receipt of a valid tax invoice.

**8      Intellectual Property**

8.1    Each Party acknowledges that the other shall retain its sole ownership of all Intellectual Property Rights which it held prior to the Commencement Date and all Intellectual Property Rights which it creates or develops independently of its obligations under this Agreement (hereafter referred to as "**SailGP Background IPR**" and "**Service Provider Background IPR**", respectively).

8.2    The Service Provider grants SailGP an irrevocable, non-exclusive, perpetual, royalty-free licence in respect of any Service Provider Background IPR contained in:

(a)    any Deliverables to the extent necessary to allow SailGP to make reasonable use of such Deliverables during and after the Term of this Agreement; and

(b)    any Equipment for the sole purpose of receiving the Services.

8.3    The Service Provider acknowledges and agrees that SailGP owns the title to and all Intellectual Property Rights in the Deliverables. The Service Provider hereby assigns to SailGP with full title guarantee, by way of present and future assignment, all Intellectual Property Rights as it may have in any Deliverables (excluding, for the avoidance of doubt, any Service Provider Background IPR), together with all rights of action and remedies (including the right to sue for damages) in relation to infringements thereof. The Service Provider shall also take all steps necessary, and procure that all other parties involved with the development of the Deliverables take all steps necessary, to ensure that SailGP owns all rights to the Deliverables. If for any reason the transfer or assignment to SailGP of the Intellectual Property Rights in the Deliverables is not effective at law, the transfer shall be effective in equity and the Service provider holds such rights on trust absolutely for SailGP.

8.4    SailGP expressly reserves all rights, title and interest in and to any and all rights not specifically granted to the Service Provider under this Agreement, including but not limited to any Intellectual Property Rights owned or licenced by SailGP and the Commercial Rights.

8.5    The Service Provider:

(a) warrants and represents, as applicable,  that any and all Deliverables (save to the extent that the Deliverables comprise SailGP Materials) are original and do not (and the use of these by SailGP in accordance with the terms and conditions of this Agreement will not) infringe the rights, including any Intellectual Property Rights, of any third party; and

EXHIBIT 1 - Page 16



(b) shall indemnify SailGP in full against all liabilities, costs, expenses, damages and losses (including but not limited to any direct, indirect or consequential losses, loss of profit, loss of reputation and all interest, penalties and legal costs (calculated on a full indemnity basis) and all other professional costs and expenses) suffered or incurred by SailGP arising out of, or in connection with, the receipt, use or supply of the Services, Equipment and any Deliverables.

**9      Liability and Indemnity**

9.1      The Service Provider will indemnify and hold harmless SailGP, its Representatives, the SailGP Entities and SailGP's client(s), and their respective parents, subsidiaries, affiliates, licensees, successors, and assigns, from and against any and all claims, damages, liabilities, costs, and expenses (including, but not limited to, reasonable counsel fees and disbursements), arising out of:

(a)      the performance of the Services and/or receipt or use of the Equipment;

(b)      any damage (including but not limited to property damage) caused by the delivery and/or use of the Services and/or Equipment; and

(c)      the breach by the Service Provider of any representation, warranty, or covenant given, or any obligation, under this Agreement.

9.2      Nothing in this Agreement shall operate to limit or exclude either Party's liability to the other for death or personal injury caused by that Party's negligence, fraudulent misrepresentation or any liability which cannot be limited or excluded by Applicable Law.

**10      Term and Termination**

10.1      This Agreement shall commence on the Commencement Date and shall expire automatically, unless terminated earlier by either Party in accordance with this Agreement, on the Expiry Date (the "**Term**").

10.2      Either Party may immediately terminate the Agreement before the expiry of the Term by written notice to the other if:

(a)      the other is in material breach of any of its obligations under this Agreement and has not remedied the same (where capable of remedy) within ten (10) days of service of notice by the other Party specifying such breach;

(b) the other is in persistent, non-material breach of its obligations under this Agreement; or

(c) (i) any meeting of creditors of such other Party is held or any arrangement or composition with or for the benefit of its creditors (including any voluntary arrangement as defined in the Insolvency Act 1986 and/or other applicable bankruptcy law) is proposed or entered into by or in relation to such other Party (other than for the purposes of bona fide reconstruction or amalgamation); (ii) a supervisor, receiver, administrator, administrative receiver or other encumbrance takes possession of or is appointed over any distress, execution or other process is levied or enforced (and is not discharged within seven days) upon the whole or any substantial part of the assets of such other Party; (iii) the other ceases or threatens to cease to carry on business or is or becomes unable to pay its debts within the meaning of Section 123 of the Insolvency Act 1986 and/or such other applicable bankruptcy laws; or (iv) a resolution is passed, any procedure is commenced, any meeting is convened or any other step is taken (including the making of an application, the presentation of a petition or the filing or service of a notice) with a view to: the other Party being adjudicated or found insolvent; the winding up or dissolution of the other Party; the other Party obtaining a moratorium or other protection from its creditors; the appointment of a trustee, supervisor, administrative or other receiver, administrator, liquidator or similar officer or encumbrancer in respect of the other Party or any of its assets; or any event analogous to any of the foregoing occurs in any jurisdiction.

10.3      Without prejudice to the generality of clause 10.2, SailGP may terminate this Agreement with immediate effect by giving written notice to the Service Provider if the Service Provider:

(a) fails to provide any of the Services, Equipment or Deliverables in accordance with this Agreement;

(b) undergoes a change of ownership or change of control; or

**EXHIBIT 1 - Page 17**

**SAIL GP**™

(c) is in breach of any Applicable Law.

10.4    Without prejudice to clauses 10.2 and 10.3, SailGP may terminate this Agreement at any time by giving thirty (30) days' written notice to the Service Provider.

10.5    The Service Provider shall keep SailGP fully and transparently informed of its ongoing financial position and particularly its ongoing solvency. The Service Provider shall immediately notify SailGP if there is, at any time during the term of this Agreement, any chance, concern or threat (however remote) as to the continuing financial solvency of the Service Provider.

## 11    Effect of Expiry or Termination

11.1    Upon termination or expiry of this Agreement:

(a) the Service Provider shall immediately: (i) if applicable, deliver to SailGP all Deliverables whether or not then complete; (ii) return the SailGP Equipment; and (iii) at SailGP's direction, either return or destroy all SailGP Materials, and if the Service Provider fails to do so, then SailGP may enter the Service Providers' premises and take possession of them. Until they have been delivered or returned, the Service Provider shall be solely responsible for the safe keeping of any and all Deliverables, SailGP Materials and SailGP Equipment in its possession and will not use them for any purpose not connected with this Agreement.

(b)    the Service Provider shall, if so requested by SailGP, provide all assistance reasonably required by SailGP to facilitate the smooth transition of the Services to SailGP or any replacement supplier appointed by it.

11.2    In the event this Agreement is terminated save pursuant to clause 10.4, SailGP shall only be liable for the Fees in respect of the Services, Equipment and Deliverables actually provided and received in accordance with this Agreement prior to the date of termination and shall be entitled to receive a pro-rata refund of any Fees paid in advance and attributed to Services, Equipment and Deliverables that have not been provided or received in accordance with this Agreement prior to the date of termination.

11.3    In the event this Agreement is terminated due to a Force Majeure Event pursuant to clause 14.4 or terminated pursuant to clause 10.4, SailGP shall:

(a)    only be liable for the Fees in respect of those of the Services, Equipment and Deliverables actually provided and received in accordance with this Agreement prior to the date of termination; and

(b)    be liable for any reasonable, validly and properly incurred, non-refundable committed costs and Expenses directly incurred by the Service Provider in the preparation for the provision of the Services, Equipment and Deliverables. The Service Provider shall have a duty to mitigate such costs and Expenses and shall provide invoices documenting such costs promptly on request,

and where such amount is less than any amount paid by SailGP prior to the date of termination, SailGP shall be entitled to receive a pro-rata refund of any Fees paid in advance in accordance with the provisions of clause 7.4.

11.4    Upon termination or expiry of this Agreement, the following clauses shall continue in force: clauses 8, 11, 12, 13, 16, and 17 (as applicable).

11.5    The termination of this Agreement by either Party for whatever reason shall not prejudice or affect the rights, obligations, liabilities or remedies of either Party which have accrued prior to such expiry or termination.

## 12    Notices

Any notice or other communication to be given under this Agreement shall be in writing in English and shall be delivered by hand, sent by prepaid first class post, (or registered airmail in the case of an address outside the United Kingdom) or sent by email to the address specified by the receiving Party to the sending Party in writing from time to time.

## 13    Announcements and Confidentiality

13.1    Each Party ("**Receiving Party**") undertakes to the other ("**Disclosing Party**"): (a) to keep confidential all Confidential Information; (b) not without the Disclosing Party's prior written consent to disclose the Confidential Information in whole or in part to any other person save those of the Receiving Party's directors, employees,

**EXHIBIT 1 - Page 18**

**SAIL GP™**

agents or professional advisers involved in the implementation of this Agreement and provided in all cases that they have a need to know the same; and (c) to use the Confidential Information solely in connection with the exercise or enjoyment of rights and/or the performance of obligations under this Agreement and not otherwise for its own benefit or the benefit of any third party.

13.2    The provisions of clause 13.1 shall not apply to the whole or any part of the Confidential Information that can be shown by the Receiving Party to be: (a) disclosed as a requirement of Applicable Law or any regulatory body to whose rule either Party is subject; (b) known to the Receiving Party prior to the date of this Agreement otherwise than as a result of being obtained directly or indirectly from the Disclosing Party; (c) obtained from a third party who lawfully possessed such Confidential Information and which has not been obtained in a breach of a duty of confidence owed to the Disclosing Party by any reason; or (d) in the public domain in the form in which it is possessed by the Disclosing Party other than as a result of a breach of a duty of confidence owed to the Disclosing Party by any person.

13.3    Without prejudice to the generality of this clause 13, each Party further undertakes to the other to make all relevant Representatives aware of the confidentiality of the Confidential Information pursuant to the provisions of this clause 13, and to use its best endeavours to ensure their compliance with the provisions of this clause 13.

13.4    The Service Provider shall not (and shall procure that its Representatives shall not), during or after the Term, whether directly or indirectly, make or release any statement, give any interview, lecture or speech, or provide any written or recorded material to any form of media in relation to this Agreement and/or concerning any aspect of the Services, Equipment and/or any Deliverables, except as permitted with the express prior written consent of SailGP and as required by Applicable Law.

**14    Force Majeure**

14.1    "**Force Majeure Event**" means any event affecting performance of this Agreement which is beyond the reasonable control of one or both of the Parties including: acts of God, extreme weather (including for the avoidance of doubt high winds), flood, drought, earthquake or other natural disaster; epidemic or pandemic (including for the avoidance of doubt COVID-19 variations or mutations thereof and any related epidemics and the residual effects thereof); terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations; nuclear, chemical or biological contamination or sonic boom; any law or any action taken by a government or public authority, including without limitation imposing an export or import restriction, quota or prohibition; collapse of buildings, fire, explosion or accident; and interruption or failure of utility service

14.2    Provided it has complied with clause 14.3, if a Party (the "**Affected Party**") is prevented, hindered or delayed in or from performing any of its obligations to the other (the "**Other Party**") under this agreement by a Force Majeure Event, the Affected Party shall not be in breach of this Agreement or otherwise liable to the Other Party for any failure or delay in the performance of those obligations. The time for performance of such obligations shall be extended accordingly. The corresponding obligations of the other Party will be suspended, and its time for performance of such obligations extended, to the same extent as those of the Affected Party under clause 14.3.

14.3    The Affected Party shall: (a) as soon as reasonably practicable after the start of the Force Majeure Event  notify the other Party in writing of the occurrence of the Force Majeure Event, the date on which it started, its estimated duration, and the effect of the Force Majeure Event on its ability to perform any of its obligations under the Agreement; and (b) use all reasonable endeavours to mitigate the effect of the Force Majeure Event on the performance of its obligations under this Agreement. Where the Affected Party is the Service Provider, clause 14.3 shall only apply where: (i) the lack of ability to perform the obligations could not have been prevented with reasonable precautions; and (ii) the Service Provider (at no cost to SailGP) takes all reasonable steps to procure the provision of replacement services materially similar to the Services for the duration of the Force Majeure Event.

14.4    Where the Other Party is SailGP, if the impact of the Force Majeure Event on the Service Provider prevents it from performing a substantial part of its obligations, SailGP: (a) may terminate this Agreement immediately by giving written notice and without liability; and (b) shall not be required to pay any Fees for the Services, Equipment and/or Deliverables not received due to the Force Majeure Event.

**15    Data Protection**

15.1    Each Party shall comply with all their obligations under the Data Protection Legislation and not by any act or omission put the other Party in breach of the Data Protection Legislation in connection with this Agreement.

EXHIBIT 1 - Page 19



15.2    The Service Provider warrants and represents it has, and shall maintain throughout the Term, data security standards (including operational and technical measures and standards) in accordance with Good Industry Practice and Applicable Law (including but not limited to the Data Protection Legislation).

**16**    **Anti-Bribery and Anti-Slavery**

16.1    The Service Provider shall, and shall procure all relevant Representatives shall: (a) comply with all Applicable Laws relating to anti-bribery and anti-corruption, including but not limited to the Bribery Act 2010 (**"Anti-Bribery Requirements"**); (b) not engage in any activity, practice or conduct which would constitute an offence under sections 1, 2 or 6 of the Bribery Act 2010 if such activity, practice or conduct had been carried out in the UK; (c) not do, or omit to do, any act that will cause or lead SailGP to be in breach of any of the Anti-Bribery Requirements; (d) not promise, offer or give or agree to give any director, officer, employee or agent of a third party any gift, financial or other advantage or consideration of any kind as an inducement or reward for doing, forbearing to do, or for having done or forborne to do any act in relation to any matter arising under this Agreement; (e) promptly report to SailGP any request or demand for any undue financial or other advantage of any kind received by the Service Provider in connection with the performance of this Agreement; and (f) have and shall maintain in place throughout the term of this Agreement its own policies and procedures, including but not limited to adequate procedures under the Bribery Act 2010, to ensure compliance with the Anti-Bribery Requirements and will enforce them where appropriate.

16.2    The Service Provider warrants and represents that neither the Service Provider, nor any of its Representatives: (a) has been convicted of any offence involving bribery or corruption, fraud or dishonesty; or (b) has been or is the subject of any investigation, inquiry or enforcement proceedings by any governmental, administrative or regulatory body regarding any offence or alleged offence.

16.3    The Service Provider shall, and shall procure all relevant Representatives shall: (a) comply with all Applicable Laws relating to anti-slavery and human trafficking, including but not limited to the Modern Slavery Act 2015 ("**Anti-Slavery Requirements**"); (b) not engage in any activity, practice or conduct which would constitute an offence under sections 1, 2 or 4 of the Modern Slavery Act 2015 if such activity, practice or conduct had been carried out in the UK; (c) not do, or omit to do, any act that will cause or lead SailGP to be in breach of any of the Anti-Slavery Requirements; (d) include in contracts with its subcontractors anti-slavery and human trafficking provisions that are at least as onerous as those set out in this clause 16.3; (e) notify SailGP as soon as it becomes aware of any actual or suspected breach of this clause 16.3; and (f) maintain a complete set of records to trace the supply chain of all Services, Equipment and Deliverables (as applicable) provided to SailGP in connection with this Agreement, and permit SailGP and its Representatives to inspect the Service Provider's premises and records, and to meet the Service Provider's personnel to audit the Service Provider's compliance with its obligations under this clause 16.3.

16.4    The Service Provider warrants and represents that neither the Service Provider, nor any of its Representatives: (a) has been convicted of any offence involving slavery or human trafficking; or (b) has been or is the subject of any investigation, inquiry or enforcement proceedings by any governmental, administrative or regulatory body regarding any offence or alleged offence.

**17**    **Insurance**

17.1    The Service Provider warrants, represents, undertakes and agrees it has obtained from an insurance provider acceptable to SailGP, and shall maintain at its own expense during the Term and for one (1) year thereafter, any and all insurance required by Applicable Law to cover the provision of the Services, Equipment and any Deliverables, and in any event, the following minimum cover ((the "**Minimum Insurance Cover**"):

(a)    employer's compensation insurance:   not less than the minimum level required by the relevant Applicable Law;

(b)    comprehensive general liability insurance: not less than US$5,000,000 per occurrence and US$10,000,000 in the aggregate;

(c)    where relevant, product liability insurance in relation to the Equipment: not less than US$10,000,000 in the aggregate; and

(d)    any other insurance policies and/or minimum levels of cover as specified by SailGP from time to time.

17.2    The Service Provider shall name SailGP, and any SailGP Entities and SailGP's client(s) (and their respective parents, subsidiaries, and affiliates) as SailGP may request from time to time, as additional insureds on all insurance

**EXHIBIT 1 - Page 20**

**SAIL GP** ™

policies required by the Minimum Insurance Cover (excluding worker's compensation), and shall provide SailGP with certificates of insurance evidencing such coverage immediately upon request. Such insurance policies will include as a term thereof that the policy will not be cancelled, modified or refused for renewal without at least thirty (30) days prior written notice to SailGP.

17.3     All insurance policies required by the Minimum Insurance Cover will be maintained with licensed insurance companies that are rated A- or better by AM Best.  The Service Provider will not undertake any Services at any time unless the policies of insurance are in effect.  All insurance policies required to be maintained will be primary and will not require contribution from any coverage maintained by SailGP and will not contain, without SailGP's prior written consent, any special or non-customary exclusions.

17.4     For the avoidance of doubt, the fulfilment of the insurance obligations hereunder will not otherwise relieve the Service Provider of any liability assumed by the Service Provider under this Agreement or in any way modify the Service Provider's obligations to indemnify SailGP, the SailGP Entities and SailGP's client(s) in accordance with clause 9.

**18       Non-Solicitation**

The Service Provider hereby covenants and agrees that during the Term, and for a period of twelve (12) months thereafter, the Service Provider shall not, without the prior written consent of SailGP, directly or indirectly, on the Service Provider's own behalf or in the service or on behalf of any third party: (a) solicit, divert or recruit any employee or contractor of SailGP or any SailGP Entity to leave such employment or engagement, whether such employment or engagement is by written contract or at will; nor (b) solicit the business or seek to enter into an existing business relationship with SailGP's client(s) or any SailGP Entity's client(s), or interfere with the contractual relationship or prospective business relations between SailGP or any SailGP Entity and its client(s).

**19       General**

19.1     The failure or forbearance by either Party on any occasion to insist upon the full performance of the terms, conditions and provisions of the Agreement shall not constitute a waiver of any breach or an acceptance of any variation of the Agreement.

19.2     This Agreement replaces, supersedes, and cancels all previous arrangements, understandings, representations and agreements between the Parties either oral or written with respect to the subject matter hereof.

19.3     Each Party acknowledges that in entering into this Agreement it has not relied upon any oral or written statements, collateral or other warranties, assurances, representations or undertakings which were made by or on behalf of the other Party in relation to the subject-matter of this Agreement at any time before its signature (together "**Pre-Contractual Statements**"), other than those which are set out in this Agreement. Each Party hereby waives all rights and remedies which might otherwise be available to it in relation to such Pre-Contractual Statements.

19.4     Nothing in clauses 19.2 to 19.3 (inclusive) shall exclude or restrict the liability of either Party arising out of its pre-contract fraudulent misrepresentation or fraudulent concealment.

19.5     Nothing herein contained shall be construed as constituting or be deemed to constitute a partnership, joint venture, agency or relationship of employer and employee between the Parties.

19.6     If at any time any provision of this Agreement is or becomes invalid, illegal or unenforceable, that provision shall be deleted, so long as the commercial purpose of this Agreement is still capable of performance and the deletion shall not in any way affect or impair the validity, legality or enforceability of that or any other provision of this Agreement.

19.7     The Service Provider's status hereunder is that of an independent contractor.  All persons employed or retained by the Service Provider in performing its obligations hereunder shall not be deemed to be employees of SailGP or its client(s).  The Service Provider shall make whatever payments may be due to such persons, and comply with all Applicable Laws in relation to its employment of, or other contractual arrangement with, such persons.

19.8     Except as expressly provided in this Agreement, the rights and remedies herein provided are in addition to and not exclusive of any rights and remedies provided by law.

EXHIBIT 1 - Page 21



19.9    Subject to clause 19.10, neither Party may assign or otherwise dispose of any of its rights or obligations under this Agreement without the other Party's prior written consent.

19.10   In order to provide the Services, Equipment and Deliverables hereunder, the Service Provider may sub-contract all or any part of its rights or obligations under this Agreement to any member of its Group or to a third party subcontractor without SailGP's consent, on the terms of, and subject always to the provisions of this Agreement.

19.11   Subject to clause 19.12, no person who is not a Party to this Agreement shall have any right to enforce this Agreement (or any agreement or document entered into pursuant to this Agreement) pursuant to the Contracts (Rights of Third Parties) Act 1999.

19.12   Where a term of this Agreement is expressed to be for the benefit of, or confers or purports to confer a right on SailGP, it shall be enforceable by the SailGP Entities in accordance with the Contracts (Rights of Third Parties) Act 1999.

19.13   No variation of this Agreement shall be valid unless it is in writing and signed by each of the Parties.

19.14   At its own expense, each Party shall, and shall use all reasonable endeavours to procure that any necessary third party shall, promptly execute and deliver such documents and perform such acts as may be required for the purpose of giving full effect to this Agreement.

19.15   In the event of any breach or alleged breach by SailGP of any obligations to the Service Provider in connection with this Agreement, the Service Provider acknowledges and agrees that its sole remedy shall be an action at law for actual monetary damages (if any) and that in no event shall the Service Provider be entitled to equitable or injunctive relief.

19.16   Without prejudice to any other rights or remedies that SailGP may have, the Service Provider acknowledges and agrees that damages alone would not be an adequate remedy for any breach of the terms of this Agreement by the Service Provider. Accordingly, SailGP shall be entitled to the remedies of injunction, specific performance or other equitable relief for any threatened or actual breach of the terms of this Agreement.

19.17   This Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of England and Wales. Each Party irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims).

19.18   This Agreement may be executed in any number of counterparts (including electronically scanned and transmitted copies) all of which, when taken together, shall constitute one and the same instrument.  A Party may enter into this Agreement by executing any counterpart.

| | | |
|---|---|---|
| **Signed** by<br><br>duly authorised for and<br>on behalf of<br><br>**SailGP** | )<br>)<br>)<br>) | Andrew Thompson<br>Managing Director |
| **Signed** by<br><br>duly authorised for and<br>on behalf of<br><br>**Service Provider** | )<br>)<br>)<br>) | |

EXHIBIT 1 - Page 22

# Attachment B

EXHIBIT 1 - Page 23

1  Derik A. Sarkesians, Esq. [SBN 311617]
   **DAS LAW LA**
2  4444 W Riverside Drive, Suite 305
   Burbank, California 91505
3  Telephone:1-818-350-8096
   Facsimile: 1-818-960-0053
4  Email: derik@daslawla.com

5  Aram Adjemian, Esq. [SBN 340399]
   **ADJEMIAN LAW, APC**
6  501 W Glenoaks Blvd. #65
   Glendale, CA 91202
7  Telephone: (818) 459-4506
   Facsimile: (818) 459-4523
8  Email: Aram@attorneyaram.com

9  Attorneys for Plaintiff, DESHAWN LOGAN

10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                        **COUNTY OF LOS ANGELES**

13

14  DESHAWN LOGAN, an Individual;              Case No.: **23LBCV01957**

15                Plaintiff,                   UNLIMITED CIVIL

16         vs.                                 **COMPLAINT**
                                               1.  **PREMISES LIABILITY**
17                                             2.  **NEGLIGENCE**
                                               3.  **BATTERY**
18  Kombu Kitchen SF LLC, a California Limited
    Liability Company, F50 LEAGUE, LLC, a
19  Delaware LLC, INSTAWORKS, INC., a          **REQUEST FOR JURY TRIAL**
    Delaware Corporation, KENNAN VATANI, an
20  Individual, and DOES 1 through 10, inclusive;

21                Defendant.

22

23        **COMES NOW**, Plaintiff, DESHAWN LOGAN, (hereafter referred to as "**Plaintiff**")

24  and complain against the above-named Defendants, Kombu Kitchen SF LLC, a California

25  Limited Liability Company, F50 LEAGUE, LLC, a Delaware LLC, INSTAWORKS, INC., a

26  Delaware Corporation, and DOES 1 through 10, inclusive (hereafter collectively referred to as

27  "**Defendants**") and alleges as follows:

28

Electronically FILED by
Superior Court of California,
County of Los Angeles
10/12/2023 9:07 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By A. Miranda, Deputy Clerk

1

**COMPLAINT**

EXHIBIT 1 - Page 24

## GENERAL ALLEGATIONS

1.     At all relevant times herein, Plaintiff is an individual and is now, and was at all times mentioned in this complaint, an individual residing in the County of Los Angeles, State of California.

2.     At all relevant times herein, Defendant KENNAN VATANI is an individual and is now, and was at all times mentioned in this complaint, an individual residing in the County of Los Angeles, State of California.

3.     At all relevant times herein, Defendant F50 LEAGUE, LLC is a Delaware Limited Liability Company licensed to do business in the State of California, County of Los Angeles.

4.     At all relevant times herein, Defendant INSTAWORKS, INC is a Delaware Corporation licensed to do business in the State of California, County of Los Angeles.

5.     At all relevant times herein, Kombu Kitchen SF LLC, a California Limited Liability Company, is licensed to do business in the State of California, County of Los Angeles.

6.     Plaintiff is ignorant of the true names and capacities, whether corporate, associate, successor, individual or otherwise, of Defendants sued herein as DOES 1 through 10, Inclusive, and therefore sues said Defendants, and each of them, by such fictitious names. Plaintiff will seek leave of court to amend this Complaint to assert the true names and capacities of the fictitiously named Defendants when the same have been ascertained. Plaintiff is informed and believes, and thereon alleges, that each Defendant designated as a "DOE" herein is legally responsible for the events, happenings, acts, occurrences, indebtedness, damages and liabilities hereinafter alleged and which caused injuries and damages to plaintiff as hereinafter alleged.

7.     Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, each Defendant, including those designated as DOES 1 through 10, Inclusive, were the agents, partners, joint venturer, representative, servant, employee, managing agent, managing supervisor, and/or co-conspirator of each of the other Defendants, and was at all times mentioned herein acting within the course and scope of said agency and employment, and that all acts and omissions alleged herein were duly committed with the ratification, knowledge, permission, encouragement, authorization and consent of each Defendant designated herein.

2

**COMPLAINT**

EXHIBIT 1 - Page 25

8.     At all relevant times mentioned herein Defendant DOES 1 through 10, inclusive, were residents of County of Los Angeles and/or business or corporate entities incorporated in and/or doing business in the State of California by virtue of the laws of the State of California.

9.     Each Defendant is the agent, servant and/or employee of the other Defendants, and each Defendant was acting within the course and scope his, her or its authority as an agent, servant and/or employee of the other Defendants. Defendants and each of them are individuals, corporations, partnerships and other entities, which engaged in, joined and conspired with the other wrongdoers in carrying out the tortuous and unlawful activities described in this Complaint, and Defendants and each of them, ratified the acts of the other Defendants as described in this complaint.

## I.

## FIRST CAUSE OF ACTION

**(By Plaintiff for Premises Liability against Defendant F50 LEAGUE, LLC and DOES 1 through 10, Inclusive)**

10.    Plaintiff incorporates in this cause of action the allegations of Paragraphs 1 through 9 of this Complaint as though set forth herein in full.

11.    On or about July 24, 2023, Plaintiff was lawfully on the premises located at 3011 Miner St, San Pedro, CA 90731 (hereafter referred to as "**SUBJECT PROPERTY**"), when he was violently attacked by Defendant, KENNAN VATANI and sustained serious bodily injuries, and damages.

12.    At all relevant times Defendants owned, operated, maintained, leased, occupied, controlled, and/or maintained the SUBJECT PROPERTY.

13.    Defendants owed Plaintiff a duty of care, and Defendants breached its duty of care by failing to maintain the SUBJECT PROPERTY reasonably safe thereby causing Plaintiff's injuries and damages.

14.    Defendants' actions were a substantial cause for Plaintiff's injuries, and damages.

15.    As a further direct and proximate result of the negligence of Defendants, Plaintiff has sustained and incurred and is certain in the future to sustain and incur losses, injuries and damages

3

<b>COMPLAINT</b>

EXHIBIT 1 - Page 26

that consist of hospital and medical expenses, loss of earnings and future earnings, and pain and
suffering/general damages.

## II.

## SECOND CAUSE OF ACTION

**(By Plaintiff for Negligence against All Defendants and Does 1 through 10, Inclusive)**

16.   Plaintiff incorporates in this cause of action the allegations of Paragraphs 1 through 15 of
this Complaint as though set forth herein in full.

17.   Defendants INSTAWORKS, INC., and/or Kombu Kitchen SF LLC, was aware of
Defendant KENNAN VATANI's propensity for violence and/or past violent threats to Plaintiff,
and still placed Defendant KENNAN VATANI in the same location where Plaintiff was working
thereby creating the environment ripe for attack.

18.   Defendants' negligence was a substantial cause for Plaintiff's injuries and damages.

## III.

## THIRD CAUSE OF ACTION

**(By Plaintiff for Battery against Defendant KENNAN VATANI and DOES 1 through 10,**

**Inclusive)**

19.   Plaintiff incorporates in this cause of action the allegations of Paragraphs 1 through 18 of
this Complaint as though set forth herein in full.

20.   Defendant KENNAN VATANI attached Plaintiff and harmed Plaintiff physically and
mentally.

21.   Plaintiff did not consent to the touching and was harmed by Defendant KENNAN
VATANI's conduct.

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1.    General damages according to proof and in an amount within the jurisdiction of this
      court;

2.    Damages for medical and related expenses according to proof;

3.    Property damage and loss of use of Plaintiff's vehicle in an amount not yet fully
ascertained;

4

**COMPLAINT**

EXHIBIT 1 - Page 27

4.    Punitive damages according to law as against Defendant Kennan Vatani;

5.    Interest according to law;

6.    Costs of this action; and

7.    Any other and further relief that the court deems proper.

DATED: October 12, 2023

DAS LAW LA

By:    _____
       Derik A. Sarkesians, Esq.
       Attorney for Plaintiff
       DESHAWN LOGAN

5

COMPLAINT

EXHIBIT 1 - Page 28

1
2
3
## DEMAND FOR JURY TRIAL
4
Plaintiff hereby requests a trial by jury.
5
6   DATED:  October 12, 2023

**DAS LAW LA**
7
8
9   By: _____

Derik A. Sarkesians, Esq.
10   Attorney for Plaintiff
DESHAWN LOGAN
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6
## COMPLAINT

EXHIBIT 1 - Page 29

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
  11766 Wilshire Blvd, Suite 730, Los Angeles, CA 90025

A true and correct copy of the foregoing document entitled (*specify*): __Limited Opposition of Debtor to Motion of F50 League, LLC, for Relief from Automatic Stay; Declaration of David B. Zolkin in Support Thereof__ will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) September 10, 2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

   See attached NEF service list.

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*)  September 10, 2024, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Attorneys for Movant F50 League LLC:
Galin G Luk
Jason R Gianvecchio
Cox Wootton Lerner Griffin & Hansen LLP
12011 San Vicente Blvd., Ste 600
Los Angeles, CA 90049

☐    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  September 10, 2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Sandra R. Klein          (Via Priority Mail)
United States Bankruptcy Judge
255 E. Temple St., Bin outside of Suite 1582
Los Angeles, CA 90012

Courtesy Email to Movant F50 League LLC:
Galin G Luk  gluk@cwlfirm.com
Jason R Gianvecchio  jgianvecchio@cwlfirm.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 10, 2024 | Martha E. Araki | /s/ Martha E. Araki |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

In re **Kombu Kitchen SF LLC**                                              **Case No. 2:23-bk-17276-SK**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Attorneys for Debtor Kombu Kitchen SF LLC: **Daniel J. Weintraub, David B. Zolkin, James R. Selth, Catherine Liu**: dweintraub@wztslaw.com; dzolkin@wztslaw.com; jselth@wztslaw.com; cliu@wztslaw.com; maraki@wztslaw.com; sfritz@wztslaw.com
- Subchapter V Trustee: **Mark Sharf**: mark@sharflaw.com; C188@ecfcbis.com; sharf1000@gmail.com; 2180473420@filings.docketbird.com
- Attorneys for American Express National Bank c/o Zwicker & Associates, P.C.: **Karen L. Belair**: kbelair@zwickerpc.com
- Attorneys for Creditors Maria de Jesus Vergara and Aja de Coudreaux, and Attorney Paul Pfeilschiefter: **Cody Alexander Bolce**: cbolce@themmlawfirm.com; enotices@themmlawfirm.com
- Interested Party/Courtesy NEF: **Todd S. Garan**: ch11ecf@aldridepite.com; TSG@ecf.inforuptcy.com; tgaran@aldridgepite.com
- Attorneys for Interested Party Sysco Corporation, Sysco San Francisco, Inc., and Newport Meat Northern California, Inc.: **Robert P. Goe, Brandon J. Iskander**: kmurphy@goeforlaw.com; rgoe@goeforlaw.com; goeforecf@gmail.com; biskander@goeforlaw.com
- Attorneys for Creditor AmTrust North America, Inc. on behalf of Wesco Insurance Company: **Alan Craig Hochheiser**: ahochheiser@mauricewutscher.com; arodriguez@mauricewutscher.com
- Attorneys for Creditors Aja de Coudreaux and Maria De Jesus Vergara, and Attorney Paul Pfeilschiefter: **Paul Pfeilschiefter**: paul.pfeilschiefter@workerrightsattorney.com
- Attorneys for Interested Parties Keven Thibeault and Kristen Thibeault: **Craig Ramsdell**: cramsdell@garofololaw.com
- Attorneys for Ally Bank c/o AIS Portfolio Services, LLC: **Amitkumar Sharma**: amit.sharma@aisinfo.com
- Attorneys for Creditor Wells Fargo Bank, N.A. dba Wells Fargo Auto: **Ashley Soto**: ashley.p.soto@wellsfargo.com
- Attorneys for Creditor Bi-Rite Restaurant Supply Co., Inc.: **Kaipo K.B. Young**: KYoung@BL-Plaw.com
- Attorneys for Creditor Night Heron Oakland, LLC: **A. David Youssefyeh**: david@adylaw.com
- US Trustee's Office: ustpregion16.la.ecf@usdoj.gov; **Ron Maroko**: ron.maroko@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_June 2012_                                                       **F 9013-3.1.PROOF.SERVICE**